## ST. PAUL, M. & M. RY. Co. *v.* PHELPS.

*(Circuit Court, D. Minnesota.* March 3, 1886.)

LAND GRANTS--LAND OUTSIDE OF STATE TO WHICH IT IS GRANTED.

Can land not within the limits of the state of Minnesota be, consistently with the policy of the United States government, held under a land grant, for the purpose of railroad construction, made to the territory of Minnesota under the act of March 3, 1857, *quœre.*

In Equity.

*Geo. B. Young* and *R. B. Galusha,* for complainant.

*W. P. Clough,* for defendant.

BREWER, J. The controversy in this case arises under the act of March 3, 1857, granting lands to the territory of Minnesota to aid in the construction of certain railroads. That portion of the grant which is material reads as follows:

"Be it enacted by the senate and house of representatives of the United States of America, in congress assembled, that there be, and is hereby, granted to the territory of Minnesota, for the purpose of aiding in the construction of railroads from Stillwater, by way of St. Paul and St. Anthony, to a point between the foot of Big Stone lake and the mouth of the Sioux Wood river, with a branch via St. Cloud and Crow Wing, to the navigable waters of the Red River of the North at such point as the legislature of said territory may determine; from St. Paul and from St. Anthony via Minneapolis to a convenient point of junction west of the Mississippi, to the southern boundary of the territory in the direction of the mouth of the Big Sioux river, with a branch via Faribault to the north line of the state of Iowa, west of range sixteen; from Winona via St. Peter to a point on the Big Sioux river, south of the forty-fifth parallel of north latitude; also from La Crescent via Target Lake, up the valley of Root river, to a point of junction with the last-mentioned road, east of range seventeen,—every alternate section of land designated by odd numbers, from six sections in width on each side of each of said roads and branches."

The western terminus of the first main line above provided for was by the legislature of Minnesota fixed at Breckenridge, and the road was completed to that place. The land in controversy lies within six miles of this road, and it is conceded that if it is within the foregoing grant the title of complainant is good. Indeed, the concessions of counsel eliminate all questions but two.

*First,* it is claimed that because the land is situated outside the state of Minnesota it is not within the grant. The facts are these: At the time of this grant, March 3, 1857, Minnesota was yet a territory, its western boundary being the Missouri river. On February 26, 1857, about a week prior thereto, congress had passed an enabling act. 11 St. at Large, 166. By this enabling act the western boundary of the proposed new state of Minnesota was designated as follows:

"Beginning at the point in the center of the main channel of the Red River of the North, where the boundary line between the United States and the British possessions crosses the same; thence up the main channel of said river to that of the Bois des Sioux river; thence up the main channel of said river

to Lake Traverse; then ceup the center of said lake to the southern extremity thereof; thence in a direct line to the head of Big Stone lake; thence through its center to its outlet; thence, by a due south line, to the north line of the state of Iowa."

Under this enabling act the state was organized and admitted into the Union the succeeding year. Breckenridge, the place named as the terminus, is situated at the junction of the Bois des Sioux and Red rivers, and on the western boundary of the state. The land in controversy is west of the Bois des Sioux river, and in the present territory of Dakota. Now, that tried by its letter the grant would include lands west of the Bois des Sioux river and in Dakota is obvious, and that congress has the power to grant to a state lands in another state or territory to aid in the construction of a road wholly within its limits is conceded. But the contention is that "it has been the uniform and settled policy of the government to confine land grants, made in aid of the construction of railroads lying wholly within a given state or territory, to lands lying within the same state or territory;" that congress must be presumed to have legislated in conformity with that policy; and having before it the strong probability, almost certainty, that Minnesota would become a state under the provisions of the enabling act just passed, fixed the western terminus of this road at the western boundary of the proposed state, and thereby limited the grant to such boundary.

Counsel for complainant deny that the cases cited warrant the conclusion as to the settled policy of the government, or that there has been any such settled policy; deny that congress fixed the terminus at the western boundary of the proposed state; and rest upon the letter of the grant. The first case cited is on the construction given to the act of September 20, 1850, (9 St. at Large, 466,) granting lands to the state of Illinois to aid in the construction of what is now known as the Illinois Central Railroad.

The seventh section reads as follows:

"And be it further enacted that, in order to aid in the continuation of said Central Railroad from the mouth of the Ohio river to the city of Mobile, all the rights, privileges, and liabilities hereinbefore conferred on the state of Illinois shall be granted to the states of Alabama and Mississippi, respectively, for the purpose of aiding in the construction of a railroad from said city of Mobile to a point near the mouth of the Ohio river; and that the public lands of the United States, to the same extent in proportion to the length of the road, on the same terms, limitations, and restrictions in every respect, shall be, and is hereby, granted to said states of Alabama and Mississippi, respectively."

A claim of the states of Alabama and Mississippi to a grant proportioned to the entire length of the line from Mobile to the Ohio river was denied, the opinion of the attorney general thus stating the rule:

"The whole length of the railroad through and within the state of Alabama, when actually surveyed and definitely located within that state, under the direction of the legislature thereof, must determine and limit and define the

extent of the grant to that state; and so likewise the whole extent of the railroad within the state of Mississippi, as surveyed and definitely fixed under the direction of the legislature thereof, must determine, limit and define the extent of the grant to that state."

A similar expression of opinion came from the attorney general construing the act of May 17, 1856, entitled "An act granting public lands in alternate sections to the states of Florida and Alabama, to aid in the construction of certain railroads in said states." 11 St. at Large, 15.

On November 24, 1871, in denying an application of the land commissioner of the St. Paul & Pacific Railroad Company for a survey and extension of its grant to these lands west of the Bois des Sioux river, the commissioner of the general land-office ruled that the grant was confined to the limits of the state.

Now, while the prior cases cited may not be strictly in point, yet I think in them is found the rule of the limitation of congressional grants to state lines. While I am not sufficiently familiar with the history of the land department to affirm it as a fact, yet, in view of these rulings, of the confident assertion of counsel, and as no single opposing ruling or action is shown, I think it not improper to assume that the uniform ruling and construction has been as stated. Indeed, when I recall the discussions and controversies which arose in the early history of this nation in respect to claims by certain states— Connecticut, New York, and Virginia—to the ownership of large bodies of lands beyond their territorial limits I do not wonder at such ruling. This very act of 1857 presents other cases in which the very question existed, and the construction given by the department could easily have been shown. I think it obvious that congress had in view the probable organization of Minnesota as a state under the enabling act just passed. It speaks of the future state of Minnesota as though the admission of a state with that name was to be soon expected; and while it may be true that a direct line between the foot of Big Stone lake and the mouth of the Sioux Wood river may cross the state line in two or more places, yet the mention of those places very forcibly suggests that congress was intending thereby to locate the western terminus on the western boundary of the proposed state. If so, was it not legislating in reference to the proposed state, and should its grant not be limited by the ordinary rule? I am aware that in this act provision was made for a road running beyond the western boundary of the proposed state and into the present territory of Dakota, with a grant of adjacent lands, which could be satisfied only by lands in Dakota, and which was in fact so satisfied. But the fact that congress provided for a road outside of the state limits does not make against the claim that it intended only the ordinary provision for a road wholly within the state. I confess that the line of reasoning above pursued is not altogether satisfactory. It seems counter to the plain letter of the statute. But the ruling of the department was

made in 1871. This bill was filed on April 29, 1884. For 13 years the action of the department has been unchallenged. Interests may have grown up on the faith of it. Indeed, counsel for defendant says that a large and flourishing village, Wahpeton, has been built upon lands whose title is similar. There are some plausible, if not convincing, reasons in favor of the ruling of the department. I am reluctant to reverse such ruling or jeopardize the rights based upon it. I think my duty compels me to sustain it until advised otherwise by the ultimate tribunal,—the supreme court; so, without considering the other question, the bill will be dismissed at complainant's costs.